UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | | |
|---|---|---|---|
| DARRIEL BLEDSOE, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| vs. | ) | No. 1:14-cv-00011-SEB-MJD | |
| | ) | | |
| CAROLYN W. COLVIN, | ) | | |
| | ) | | |
| Defendant. | ) | | |

## REPORT AND RECOMMENDATION

Darriel Bledsoe ("Plaintiff" or "Bledsoe") requests judicial review of the final decision of

the Commissioner of the Social Security Administration ("Commissioner" or "Defendant")

denying her application for Social Security Disability Insurance Benefits ("DIB") under Title II

of the Social Security Act ("the Act"). *See* 42 U.S.C. §§ 416(i), 423(d). For the reasons set forth

below, the Magistrate Judge recommends that the decision of the Commissioner be **REVERSED**

**AND REMANDED**.

## <u>Procedural History</u>

Bledsoe filed an application for DIB on August 11, 2011 alleging an onset of disability

on January 3, 2010. Bledsoe's application was denied initially on October 26, 2011, and on

reconsideration on December 28, 2011. Bledsoe requested a hearing, which occurred before

Administrative Law Judge ("ALJ") Mark C. Ziercher on October 31, 2012. The ALJ concluded

Plaintiff was not disabled at any time from her alleged onset date through the date of the ALJ's

January 25, 2013 decision. The Appeals Council denied Bledsoe's request for review on

November 14, 2013, rendering the ALJ's decision final. Bledsoe filed her Complaint with this

Court on January 7, 2014.

## Factual Background and Medical History

Plaintiff Bledsoe was born in 1967 and worked as an X-ray technician, cashier, stocker, and customer service manager before she applied for disability benefits with an alleged onset of disability on January 3, 2010. [Dkt. 15 at 1, 3.]

Dr. Michael E. Day treated Bledsoe between January 2009 and February 2010. [Dkt. 16 at 15.] In November 2009, Dr. Day stated that Bledsoe suffered from "intermittent severe migraine headaches." [R. at 313.] He opined that the condition would "cause episodic flare-ups periodically preventing [Bledsoe] from performing [her] job functions," and stated "she will need treatment for migraine headaches" during the flare-ups. [R. at 314.] He estimated Bledsoe would experience flare-ups three times per month for five hours per episode, but noted the flare-ups were "very unpredictable." [R. at 314.] At appointments in January and February of 2010, Dr. Day included "migraine headaches" in Plaintiff's list of "active problems." [R. at 276, 279, 282.]

In January 2010, Plaintiff began using Flexeril and Inderal, but the headaches persisted, and later that month, Plaintiff was hospitalized with an "intractable headache." [R. 299.] Dr. David A. Glander treated her at the hospital. [R. at 267.] He reported that medications had proved ineffective, [*id.*], but prescribed Verapamil for "headache prevention." [R. at 311.] Glander also ordered a brain MRI and lab tests, both of which were negative. [R. at 267.] Plaintiff reported back pain, but X-rays were normal. [R. at 309.] The hospital treated Plaintiff with intravenous analgesics and discharged her after the headache resolved. [R. at 266-67.]

In February 2010, Dr. Glander completed portions of Plaintiff's application for disability benefits. [R. at 572.] He indicated that the "primary diagnosis preventing the patient from working" was "severe headaches (intractable)." [*Id.*] He described these as "chronic debilitating

daily headaches." [*Id.*] Dr. Glander also noted hypertension, disk herniation, and "chronic neck pain radiating up neck towards head." [*Id.*] He wrote that "due to the debilitating nature of her chronic headaches," Plaintiff was unable to do "work of any kind." [*Id.*]

Dr. Glander also referred Plaintiff for a neurological consultation with Dr. Daniel Spomar. [R. at 324.] At the February 16, 2010 consultation, Plaintiff complained of "constant neck pain and headache," and Dr. Spomar noted that "debilitating migraine headaches" had kept Plaintiff "out of work for the last month." [R. at 324.] A spinal MRI showed cervical spondylosis at the C5-6 and C6-7 vertebrae. [R. at 325.] Dr. Spomar recommended physical therapy and a consultation with an interventional pain specialist, but did not recommend surgery. [*Id.*]

In June 2010, Plaintiff was in an ATV accident in which the vehicle landed on top of her. [R. at 444.] Dr. Doug Matthews subsequently treated Plaintiff for neck pain, right arm pain, back pain, and headaches. [R. at 343, 346.] Dr. Matthews noted a history of migraine headaches and Plaintiff's examination was "[p]ositive for headaches." [R. at 343.] Dr. Matthews suggested physical therapy and epidural injections. [*Id.*] At a follow-up appointment in September 2010, Bledsoe reported that the therapy and injections "help[ed] some," and that her pain was "not quite as intense as it used to be." [R. at 344.]

In 2011, Plaintiff received treatment at Wishard Memorial Hospital. [R. at 426.] The hospital noted that she continued to use Verapamil. [R. at 418, 428.] By this time, Plaintiff was "on unemployment" and reported back pain so severe that she could not stand for more than ten minutes at a time. [*Id.*] A June 2011 MRI showed "compression and deformity of the ventral spinal cord" consistent with "chronic fracture and/or severe degenerative disc disease." [R. at 410.] The hospital prescribed Vicodin and Percocet. [R. at 431, 433.] Plaintiff later reported that

Vicodin was "not helping with the pain," [R. at 435], and that Percocet "is not controlling her pain." [R. at 474.]

Plaintiff underwent a state agency physical consultative examination in September 2011. [R. at 444-46.] She reported neck and back pain that had persisted since her June 2010 ATV accident. [R. at 444.] She also reported losing her job as an X-ray technician in August 2010. [*Id.*] The examination was positive for migraine headaches and back pain, [R. at 445], but the examiner reported good motor strength and no muscle weakness. [R. at 446.]

In October 2011, state agency physician Dr. M. Brill reviewed the record and noted Plaintiff's history of degenerative disc disease and disc protrusion. [R. at 479.] He determined Plaintiff could perform a limited range of sedentary work. [R. at 480-86; Dkt. 15 at 13.] Dr. A Dobson reviewed the record and agreed with Dr. Brill's opinion. [R. at 487.]

Plaintiff began seeing neurologist Karsten Fryburg, M.D., in 2012. [R. at 498.] Plaintiff reported that her neck was still "quite painful," [*id.*], but Dr. Fryburg recommended "conservative" treatment options such as physical therapy. [*Id.*] Plaintiff continued to use Verapamil and also reported using morphine and ibuprofren. [R. at 514.] Despite these medications, Fryburg stated that Plaintiff's pain limited her to walking two blocks at a time. [*Id.*] A September 2012 exam with Dr. Fryburg was positive for headaches. [R. at 515]. August 2012 and October 2012 office visits noted Plaintiff's history of "migraine headaches," but Plaintiff had no complaints of headache on the days of the visits. [R. at 527, 534.]

Plaintiff testified, with her counsel present, before ALJ Mark Ziercher on October 31, 2012. [R. at 33.] She stated that she was on state unemployment benefits in 2011, during which time she sought work as an X-ray technician or cashier. [R. at 40-41.] She reported that medication did not manage her back pain, that she could stand for only 15 minutes, and that she

could walk for only one block. [R. at 42-45.] She also testified that she continued to suffer both

"regular" and "migraine" headaches, with migraines lasting "anywhere from one to three days"

once every one to two months. [R. at 67-68.] Plaintiff said that pain medication did not ease the

pain and that she had to lay down until the headaches passed. [R. at 68.] Plaintiff added that her

medications caused dizziness and other side effects that required her to lay down for two to three

hours at a time. [R. at 64.]

Vocational expert George Coleman also testified at the hearing. Based on the

hypothetical questions the ALJ presented, Coleman testified that available work opportunities

included address clerk, food and beverage order clerk, or pari-mutuel ticket taker. [R. at 73-74.]

Plaintiff's counsel then asked what job opportunities would be available if the hypothetical

worker required unscheduled breaks for up to an hour at a time. [R. at 80.] Coleman replied that

this requirement would preclude the types of work he had identified. [R. at 81.] Plaintiff's

counsel then asked whether work would be available if the hypothetical person had to "be absent

from work for two days per month as a result of their impairments or their treatment." [*Id.*]

Coleman replied that this would exceed the acceptable level of absenteeism for the types of work

he had previously described. [*Id.*]

## **Applicable Standard**

To be eligible for DIB, a claimant must have a disability under 42 U.S.C. §

423.[1] Disability is defined as "the inability to engage in any substantial gainful activity by reason

of any medically determinable physical or mental impairment which can be expected to result in

---

[1] In general, the legal standards applied in the determination of disability are the same regardless of whether a claimant seeks DIB. However, separate, parallel statutes and regulations exist for Disability Insurance Benefits and Supplemental Security Income claims.  Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted court decisions.

death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work, but any other kind of gainful employment which exists in the national economy, considering her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, she is not disabled despite her medical condition and other factors. 20 C.F.R. § 404.1520(b). At step two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits her ability to perform basic work activities), she is not disabled. 20 C.F.R. § 404.1520(c). At step three, the Commissioner determines whether the claimant's impairment or combination of impairments meets or medically equals any impairment that appears in the Listing of Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-month duration requirement; if so, the claimant is disabled. 20 C.F.R. § 404.1520(d). At step four, if the claimant is able to perform her past relevant work, she is not disabled. 20 C.F.R. § 404.1520(f). At step five, if the claimant can perform any other work in the national economy, she is not disabled. 20 C.F.R. § 404.1520(g).

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* This court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ "need not evaluate in

writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). To be affirmed, the ALJ must articulate her analysis of the evidence in her decision; while she "is not required to address every piece of evidence or testimony," she must "provide some glimpse into her reasoning . . . [and] build an accurate and logical bridge from the evidence to her conclusion." *Dixon*, 270 F.3d at 1176.

## The ALJ's Decision

The ALJ first determined that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2015. [R. at 13.] Applying the five-step analysis, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since the January 3, 2010 alleged onset of disability. [*Id.*] At step two, the ALJ determined that Plaintiff had the "severe impairments of degenerative disc disease of the cervical, thoracic, and lumbar spines." [R. at 14.] At step three, the ALJ determined that Plaintiff's impairments alone or in combination did not meet or medically equal the severity of an entry in the Listing of Impairments. [R. at 16.]

After step three but before step four, the ALJ found Plaintiff had the residual functional capacity ("RFC") to:

> lift and/or carry 10 pounds occasionally and less than 10 pounds frequently. She can perform goal-oriented rather than production-oriented work. She can stand and/or walk for up to 30 minutes uninterrupted for up to a total of 6 hours in an 8-hour workday, and can sit for up to 1 hour uninterrupted for up to a total of 6 hours in an 8-hour workday. She can occasionally climb ramps and stairs; can never climb ladders, ropes, or scaffolds; and can occasionally balance, stoop, kneel, crouch, and crawl. Regarding the neck, she can perform flexion, extension, and rotation frequently. She can frequently reach in all directions bilaterally. She can frequently feel, handle, and finger bilaterally. She can have frequent exposure to wetness and moving mechanical parts (as defined in the Selected Characteristics of Occupations), and to uneven terrain. She can perform

productive work tasks for up to an average of 96 to 100% of an 8-hour workday, not including the typical morning, lunch, and afternoon breaks.

[R. at 17.]

At step four, the ALJ determined Plaintiff could not perform her past relevant work as a customer service manager or X-ray technician. [R. at 22.] At step five, the ALJ determined that a person of Plaintiff's age, education, work experience, and residual functional capacity could perform work as an address clerk, food and beverage order clerk, or pari-mutuel ticket taker. [R. at 23.] Because these jobs existed in significant numbers in the national economy, the ALJ concluded Plaintiff was not disabled. [*Id.*]

## Discussion

 Plaintiff presents four arguments for remand of the ALJ's decision. [Dkt. 15 at 1.] She argues 1) that the ALJ failed to evaluate the November 2009 opinions of treating physician Dr. Day [*id.* at 7]; 2) that the ALJ erroneously evaluated neurologist Dr. Glander's opinions [*id.* at 11]; 3) that the ALJ improperly construed the non-examining state agency opinions as substantial evidence for his RFC analysis [*id.* at 13]; and 4) that the ALJ improperly found Bledsoe's testimony not credible. [*Id.* at 15.] The Court addresses these arguments in turn.

### 1. Dr. Day's November 2009 Opinion

Plaintiff argues that the ALJ's RFC assessment and step-five decision were flawed because the ALJ "erroneously failed to evaluate" treating[2] physician Dr. Day's November 2009 opinion that Plaintiff suffered "intermittent severe migraine headaches." [Dkt. 15 at 7; R. at 313.] She argues that an ALJ must expressly evaluate a treating physician's opinion and must give that opinion controlling weight if supported by medical evidence, such that the ALJ erred by not considering the November 2009 opinion. [*Id.* at 8-10.] She adds that this error was harmful

---

[2] Defendant does not contest whether Dr. Day had a "treating" relationship with Plaintiff. [*See* Dkt. 16.]

because the ALJ did not account for Plaintiff's headaches in his RFC assessment and step-five conclusions.[3] [*Id.* at 11.] Defendant concedes that the ALJ "did not explicitly consider Dr. Day's November 2009 opinion," but contends that "any error was harmless." [Dkt. 16 at 1.]

Plaintiff is correct that an ALJ must expressly consider the opinion from a treating physician. First, the applicable regulations state that Social Security Administration officials will "always give good reasons in [their] notice of determination or decision for the weight [they] give [an applicant's] treating source's opinion." 20 C.F.R. § 404.1527(c)(2); *see also id.* § 404.1527(e)(2)(iii) (stating that ALJs must comply with this requirement). Second, the Seventh Circuit has established the same requirements. *See, e.g.*, *Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998) (describing as "unacceptable" a decision that "fail[ed] to so much as mention" opinion of treating physician). The ALJ in this case never mentioned Dr. Day's 2009 opinion and did not discuss the impact of Plaintiff's headaches. [*See* R. at 13-22.] He thus failed to give "good reasons" for not incorporating limitations related to Plaintiff's headaches in his RFC assessment and step five conclusions.

Defendant claims this error was harmless. [Dkt. 16 at 8.] An error is harmless "if it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). The "fact that the administrative law judge, had she considered the entire record, might have reached the same result does not prove that her failure to consider the evidence was harmless." *Id.*

---

[3] As the ALJ himself acknowledged, [R. at 13], the RFC analysis must account for even those impairments that are not severe. 20 C.F.R. § 404.1545(a)(2). Thus, even if the ALJ did not include migraines or headaches as a "severe" impairment at step two, [R. at 14], he was required to consider these impairments at later steps.

Defendant notes that to establish a disability for the purposes of the Act, Plaintiff must "show at least a continuous 12-month period of disability between January 2010 and the date of the ALJ's decision." [Dkt. 16 at 8.] Defendant then contends that Dr. Day's November 2009 opinion was "time-sensitive" in that he "opined only regarding the following 6-month period," such that "no reasonable ALJ could have credited Plaintiff's allegations that her headaches were disabling" for 12 months. [*Id.*]

Defendant's argument mischaracterizes the record. The November 2009 opinion was part of a form that Dr. Day completed for a Family and Medical Leave Act ("FMLA") application. [R. at 313.] Question 7 on the form instructs the doctor: "Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and duration of related incapacity that the patient may have over the next 6 months." [R. at 314.] Dr. Day responded with an estimate of three flare-ups per month for five hours at a time. [*Id.*] He did not say that the condition would abate after six months. [*Id.*] Any conclusion that he meant to limit the duration of Bledsoe's condition to six months is based on the faulty assumption that the form's specific interest in the *next* six months somehow establishes that any listed condition would not persist into the period *after* those six months.[4] Defendant's argument that Dr. Day's opinion cannot be the basis for a 12-month period of disability thus rests on an erroneous conclusion unsupported by the record.

Defendant further argues that Plaintiff herself conceded that Dr. Day's opinion was time-sensitive. [Dkt. 16 at 8.] Plaintiff made no such concession: Plaintiff's brief notes only that "Dr. Day predicted that over the next six months Bledsoe would have three episodes [of migraines]

---

[4] The six month time period likely derives instead from the regulations governing the FMLA: "In all cases, an employer may request a recertification of a medical condition every six months in connection with an absence by the employee." 29 C.F.R. § 825.308(b).

every month." [Dkt. 15 at 10.] Plaintiff said nothing about the extent of migraine headaches after those six month. [*Id.*]. Further, in her reply, Plaintiff notes that Dr. Day never provided any explanation describing why Plaintiff's migraines would abate after six months. [Dkt. 17 at 3.] Again, then, Defendant had no basis for concluding that Dr. Day's opinion was limited to the six-month period following November 2009.

Defendant finally contends that Plaintiff did not seek medical treatment for headaches after June 2010, suggesting that her headaches had indeed abated within approximately six months of Dr. Day's opinion. [Dkt. 16 at 8.] First, this failure to seek treatment does not, in and of itself, establish that Plaintiff's headaches had abated. Plaintiff reported in November 2009 and January 2010 that she tried "numerous meds" for her migraine headaches, but had found they either caused undesirable side effects or were ineffective. [R. at 288, 299.] Thus, Plaintiff's alleged lack of treatment for her headaches may have resulted from ineffectiveness of prior treatment attempts, rather than an abatement of her condition. *See* SSR 96-7p ("[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any . . . other information . . . that may explain . . . failure to seek medical treatment."); *see also Garcia v. Colvin*, 741 F.3d 758, 761 (7th Cir. 2013) ("[A]n administrative law judge is not allowed to infer from an applicant's failure to have sought medical care that he's a malingerer without asking him *why* he didn't seek care.").

Moreover, Plaintiff's doctors continued to monitor her headaches long after the alleged cessation of treatment: at a March 2012 appointment, for instance, Plaintiff's doctor noted a "change in [her] headaches," [R. at 491], and at appointments in August and October of 2012, Plaintiff's doctor noted her history of migraines but reported no complaints of headaches on

those particular days.[5] [R. at 527, 534.] Further, Dr. Glander prescribed the anti-migraine medication Verapamil during Plaintiff's 2010 hospitalization. [R. at 311.] Plaintiff continued to take this medication throughout the times relevant to her DIB application. [*See, e.g.*, R. at 424 (ordering Verapamil in May 2011); R. at 475 (listing Verapamil in medications in September 2011); R. at 548 (adjusting Verapamil dosage in August 2012).] Thus, even assuming Defendant is correct in her assertion that Plaintiff did not seek treatment specifically for headaches, Plaintiff continued to take anti-migraine medication, suggesting that headaches continued to affect her ability to function long after the 6-month period to which Defendant argues Plaintiff's headaches were confined.

Finally, Plaintiff notes in reply that it is the Commissioner, not the ALJ, who discusses the alleged lack of treatment. [Dkt. 17 at 4.] The Commissioner would thus have the court violate the *Chenery* doctrine in upholding the ALJ's decision. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962) ("*Chenery* requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself").

For these reasons, the Court finds that Plaintiff's headaches could have been the basis for a continuous 12-month period of disability. The Court therefore lacks "great confidence," *Spiva*, 628 F.3d at 353, that the ALJ's decision would be the same had he considered these headaches. Hence, the ALJ's error was not harmless, and remand is necessary for the ALJ to consider Dr. Day's opinion and properly explain any decision to discount it.

---

[5] As the Seventh Circuit recently noted, the fact that a person "did not have a headache at the time of that visit is no reason to conclude anything about the frequency or severity of her migraines." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014), *as amended on denial of reh'g* (Oct. 24, 2014). Thus, Plaintiff's lack of symptoms at the August and October office visits is no basis for Defendant's conclusion that Plaintiff no longer suffered from migraines.

## 2. Dr. Glander's Opinion

Plaintiff next argues that the ALJ erred by discounting treating neurologist Dr. Glander's opinion. [Dkt. 15 at 11.] As noted above, Dr. Glander opined in February 2010 that Plaintiff suffered from chronic debilitating headaches, such that she was unable to do "work of any kind". [R. at 572.] The ALJ gave Dr. Glander's opinion "no weight" because the "final responsibility for deciding whether the claimant is 'disabled' under the Social Security Act is reserved to the Commissioner." [R. at 20.]

This was legal error. Although the issue of a claimant's disability is "reserved to the Commissioner," the "opinions from any medical source about issues reserved to the Commissioner must never be ignored," and the ALJ's decision "must explain the consideration given to the treating source's opinion." SSR 96-5p. The ALJ thus was not entitled to give "no weight" to Dr. Glander's opinion, regardless of whether it touched the issue of Plaintiff's status as "disabled."

Defendant argues this error was harmless. First, she restates her argument that Plaintiff's headaches were limited to the six months after Dr. Day's November 2009 opinion. [*See* Dkt. 16 at 9.] As described above, however, this argument ignored the evidence of continuing treatment for headaches and ultimately rested on the erroneous conclusion drawn from Defendant's FMLA form. Further, Dr. Glander's opinion did not limit the duration of Plaintiff's headaches: instead, he described Plaintiff's headaches as "chronic," [R. at 572], belying the notion that the headaches would soon improve. Finally, the ALJ never discussed the alleged lack of treatment, [*see* R. at 20], such that this argument consists of post-hoc rationalization that would violate the *Chenery* doctrine. *See Burlington Truck Lines*, 371 U.S. at 168-69.

The Commissioner then argues that any error was harmless because "Plaintiff has failed to identify any limitations that the ALJ should have included based on Dr. Glander's opinions." [Dkt. 16 at 10.] Defendant correctly notes that the Supreme Court has stated that "the party that seeks to have a judgment set aside because of an erroneous [agency] ruling carries the burden of showing that prejudice resulted." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citation and internal quotation marks omitted). Further, "the party seeking reversal normally must explain why the erroneous ruling caused harm," unless "the circumstances of the case will make clear to the appellate judge that the ruling, if erroneous, was harmful." *Id.* at 410.

The Commissioner's reliance on *Shinseki* fails for two reasons. First, "the circumstances of [this] case" make it "clear" why the ALJ's decision was erroneous: failing to credit a doctor's report of "chronic debilitating daily headaches" that leave a person unable to do "work of any kind," [R. at 572], plainly affects the determination of whether Plaintiff could perform substantial gainful activity. Second, Plaintiff specifically explained that the "ALJ's error with respect to Dr. Glander's opinions was harmful" because his RFC analysis and questions to the vocational expert "did not account for Bledsoe's chronic disabling headaches." [Dkt. 15 at 12.] Thus, Plaintiff *did* explain "why the erroneous ruling caused harm." *Shinseki*, 556 U.S. at 410. Any error therefore was not harmless, and on remand, the ALJ should properly consider Dr. Glander's opinion and, if necessary after this consideration, include limitations related to that opinion in his RFC assessment and step-five analysis.

### 3. Non-Examining State Agency Opinions

Plaintiff notes that Dr. Dobson and Dr. Brill opined that Bledsoe "could perform a limited range of 'sedentary' work." [Dkt. 15 at 13; R. at 480-87.] The ALJ accorded "[s]ignificant weight" to these opinions and stated that such expert opinions are "entitled to considerable

deference when they are supported by the record." [R. at 20.] Plaintiff argues that it was erroneous for the ALJ to rely on these opinions because 1) neither doctor considered Plaintiff's headaches; and 2) the ALJ legally erred by granted an improper amount of "deference" to the reviewing doctors. [Dkt. 15 at 13.]

"[T]he opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record . . . including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency." SSR 96-6p. The ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician, psychologist, or other medical specialist." 20 C.F.R. § 404.1527(e)(2)(ii). Failure to offer an explanation can be grounds for remand. *See, e.g.*, *Ivey v. Astrue*, No. 2:11-CV-083-JD, 2012 WL 951481, at *13 (N.D. Ind. Mar. 20, 2012).

The ALJ in this case explained that the opinions of the state agency experts were "useful" because they were offered "by persons who have extensive experience with the Social Security Administration disability process." [R. at 21.] He also explained he adopted the "exertional level and postural limitations opined" in the state agency reports because they were consistent "with the medical evidence, and in particular the musculoskeletal imaging." [*Id.*]

Neither state agency doctor, however, reviewed the medical evidence of Plaintiff's headaches. [*See* R. at 479-87.] Instead, they reviewed records related to Plaintiff's degenerative disc disease and disc protrusion, such as Plaintiff's June 2011 spinal MRI [R. at 480.] Dr. Brill also referenced the September 2011 examination at the state disability determination bureau. [R. at 480-81.] That exam was "positive" for "migraine headache," [R. at 445,] but Dr. Brill cited only the range of motion findings from that exam. [R. at 480-81.] He did not consider the report

of migraine headaches. [*See id.*] Further, the record contains evidence of headaches that accumulated after the state agency doctors completed their reviews, [*see, e.g.*, R. at 491, 515], and Plaintiff testified at the October 2012 hearing that she continued to suffer from headaches. [R. at 67-68.] The state agency doctors necessarily did not consider this later evidence.

The ALJ, however, did not explain the discrepancy between the record evidence of headaches and the "significant weight" he afforded the state agency doctors' opinions. [*See* R. at 21.] He wrote that the "exertional and postural limitations" that the reviewing experts indicated were consistent with the "musculoskeletal imaging" in the record, but did not explain why their failure to mention Plaintiff's headaches was excusable or consistent with the record. [*Id.*] Further, he did not explain why the later evidence of Plaintiff's headaches, such as Plaintiff's hearing testimony, did not erode the weight given to the state experts' opinions.[6] [*Id.*]

The ALJ therefore did not comply with the direction that he "must explain" the weight given to the reviewing exerts, 20 C.F.R. § 404.1527(e)(2)(ii), and did not comply with the direction that state experts' opinions can "be given weight only insofar as they are supported by evidence in the case record . . . including any evidence . . . that was not before the State agency." SSR 96-6p. The ALJ's RFC determinations were therefore based on an incomplete account of Plaintiff's impairments, [*see* R. at 21], such that remand is necessary to reconsider the state agency experts' opinions in light of the entire of record. *See Ivey*, 2012 WL 951481, at *14 (remanding where ALJ gave "significant weight" to state expert without explaining why omission of certain records from experts' review made no difference in RFC assessment).

---

[6] The ALJ did note that he "tempered" the limitations that Plaintiff described during the hearing because he did not find Plaintiff entirely credible, [R. at 21], but this finding was related to Plaintiff's "stand, walk, and sit limitations," rather than Plaintiff's testimony about her headaches. [*See id.*]

Plaintiff's second argument related to the state experts is that the ALJ committed legal error by granting "considerable deference" to the opinions of the state agency reviewing experts. [Dkt. 15 at 13.] She argues that no regulations provide for "deference" to state agency opinions and asserts that a claimant is entitled to a "de novo" hearing. [*Id.* at 13; Dkt. 17 at 6.] Defendant responds that the ALJ did not "defer" to the state-agency reviewers, and that the ALJ was entitled to grant their opinion significant weight. [Dkt. 16 at 15.]

Plaintiff is correct that she is entitled to a de novo hearing. *See* 42 U.S.C. § 405(b) (directing Commissioner of Social Security—not state agency experts—to make "findings of fact"). Defendant, however, is correct that an ALJ may accord great weight to state agency doctors. *See, e.g.*, 20 C.F.R. § 404.1527(e)(2)(i) (describing state agency doctors as "highly qualified . . . experts in Social Security disability evaluation); *see also Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (approving ALJ decision to "give greater weight" to state experts than other medical sources); *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) ("It is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation.")

Ultimately, this dispute over "weight" versus "deference" is largely semantic. *See, e.g.*, *M.B. ex rel. Berns v. Hamilton Se. Sch.*, 668 F.3d 851, 860 (7th Cir. 2011) (describing "due weight" for an agency on factual matters as "the usual deference"). Additionally, it is not clear in this case whether the ALJ actually "deferred" to the state experts at all. Although he stated that state experts often receive "considerable deference," [R. at 20], he also correctly acknowledged that he was "neither bound nor controlled by the state" expert opinions. [R. at 21; 20 C.F.R. § 404.1527(e)(2)(i) ("[ALJs] are not bound by any findings made by State agency medical or psychological consultants.")]. Standing alone, then, this dispute over deference does not warrant

remand. However, because remand is necessary for the reasons previously described, the ALJ should be mindful that the Plaintiff is entitled to a de novo review of her claim. The ALJ may grant the state agency experts significant weight based on their medical specialty, supporting evidence in the case record, and other factors, *see* 20 C.F.R. § 404.1527(e)(2)(ii), but should continue to view the state agency opinions as non-binding.

### 4. The ALJ's Credibility Determination

Plaintiff finally argues that substantial evidence does not support the ALJ's credibility finding because the ALJ's conclusions were based on an error of law. [Dkt. 15 at 15.] Defendant responds that the ALJ's credibility finding was adequately explained because he minimally articulated the reasoning underlying his credibility determinations. [Dkt. 16 at 12-14.]

The ALJ in this case found Plaintiff only "partially credible." [R. at 20.] Although Plaintiff "described activities that are fairly limited," the ALJ found that two factors weighed against her credibility: First, "allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty."[7] [*Id.*] Second, "even if the claimants' daily activities are as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the medical evidence and other factors discussed in this decision." [*Id.*]

---

[7] As an initial matter, requiring a "reasonable degree of certainty" is not the proper legal standard. *See, e.g., Behymer v. Apfel*, 45 F. Supp. 2d 654, 662 (N.D. Ind. 1999) ("[A]lthough the ALJ can choose to disbelieve testimony for the reasons set forth in the regulations, etc., objective verifiability to a reasonable degree of certainty is not a requirement imposed by law."). Other courts, however, have found that such "reasonable degree of certainty language" did not "state a standard by which the ALJ made his adverse determination of Claimant's credibility," but instead was "merely a common sense observation that the ALJ would not treat Claimant's testimony as 'strong evidence' of her disability." *Wall v. Astrue*, 561 F.3d 1048, 1070 (10th Cir. 2009). Thus, the ALJ's use of this language in this case was acceptable insofar as it *was* a "common sense observation," but the ALJ on remand should be cognizant that the law does not require Plaintiff to verify her subjective complaints of pain with objective evidence to a reasonable degree of certainty.

The Seventh Circuit criticized this sort of reasoning in *Moore v. Colvin*, 743 F.3d 1118 (7th Cir. 2014). There, an ALJ disregarded a claimant's testimony that she suffered from debilitating migraine headaches. The ALJ stated that two factors weighed against crediting the testimony: First, "the limitations cannot be objectively verified with any reasonable degree of certainty." *Id.* at 1125. Second, "even if [the plaintiff's] activities were so limited, it would be difficult to attribute that to a medical condition as opposed to other evidence in view of the relatively weak medical evidence and the other factors . . . discussed in the decision." *Id.*

## A. Factor One: Limitations Cannot Be Objectively Verified

The Seventh Circuit in *Moore* found the first factor was not persuasive and stated that "the ALJ erred in rejecting [the plaintiff's] testimony on the basis that it cannot be objectively verified with any reasonable degree of certainty." *Id.* Instead, "if a claimant has established a medically determined impairment that could reasonably be expected to produce the pain," then the "ALJ *must* consider subjective complaints of pain." *Id.* (emphasis added).

In this case, Plaintiff established through medical evidence that she suffered from migraines. [*See, e.g.*, R. at 299, 314.] Thus, Plaintiff had a "medically determinable impairment" that "could reasonably be expected to produce" the headaches, and the ALJ was accordingly obligated to consider Plaintiff's subjective complaints of pain. *Moore*, F.3d at 1125.

The ALJ did not do so. He noted only that Plaintiff complained of "intractable headaches" in 2010. [R. at 18.] He did not discuss the positive finding for migraine headaches at Plaintiff's 2011 consultative exam [R. at 445]; the positive finding for headaches at Plaintiff's September 2012 exam [R. at 515]; or Plaintiff's hearing testimony about the intensity and frequency of her headaches. [R. at 67-69.] The ALJ therefore erred in ignoring Plaintiff's subjective evidence of headaches.

Further, although the ALJ was not "required" to credit Plaintiff's testimony, *Moore*, 743 F.3d at 1126, the ALJ did not sufficiently explain why he discounted Plaintiff's statements. The ALJ presented two potential rationales for discounting Plaintiff's headaches: First, he provided a broad conclusion that "there is insufficient objective medical evidence that the impairments are of such severity that they can reasonably be expected to give rise to the alleged level of pain and limitations." [R. at 20.] This sort of blanket explanation, however, is not sufficient to discount Plaintiff's testimony. *See Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) ("[T]he ALJ cannot reject a claimant's testimony about limitations on her daily activities solely by stating that such testimony is unsupported by the medical evidence.").

Second, the ALJ stated that a 2010 MRI of Plaintiff's brain was normal, [R. at 18], suggesting Plaintiff's complaints of headaches at that time may have been exaggerated. Defendant argues that this was enough to "minimally articulate" the ALJ's view of Plaintiff's credibility. [*See* Dkt. 16 at 12, 14 (citing *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008).] This argument is flawed: "Doctors use MRIs *to rule out other possible causes of headache—such as a tumor—meaning that an unremarkable MRI is completely consistent with a migraine diagnosis.*" *Moon*, 763 F.3d at 722 (emphasis original). Thus, the 2010 MRI was no basis at all for discrediting Plaintiff's testimony. Moreover, focusing on this test alone ignores the medically documented evidence of migraine headaches occurring in 2011 and 2012. [*See, e.g.*, R. at 445, 515.] The ALJ did not address this later evidence, making his focus on the single test an insufficient basis on which to discount Plaintiff's testimony. *See Moore*, 743 F.3d at 1126 (noting error where ALJ failed to "address the evidence in a balanced manner"); *Herron*, 19 F.3d at 333 (requiring decision to reject evidence to be "based upon consideration of all the relevant evidence").

### B. Factor Two: Other Explanations for Limitations

The Seventh Circuit in *Moore* also criticized the ALJ's second reason for rejecting the plaintiff's testimony. The court stated that the conclusion that the plaintiff's limitations were related to factors other than the plaintiff's headaches rested on a "skewed portrayal of the evidence that ignor[ed] extensive evidence of chronic debilitating migraines, including recognition of that problem by all treating physicians." *Moore*, 743 F.3d at 1125 (7th Cir. 2014). In this case, as well, Plaintiff's physicians recognized her chronic migraines, [*see, e.g.*, R. at 299, 314, 324, 572], and the record contains other evidence of headaches and migraines. [*See, e.g.*, R. at 445, 515.] The ALJ seems to have discounted this evidence on the basis of Plaintiff's "normal" brain MRI in 2010, [R. at 18], but this focus on a single diagnostic test—without regard for the other medical evidence—presents the same sort of "skewed portrayal" of the record that the court faulted in Moore. Again, then, the ALJ did not sufficiently explain his rejection of Plaintiff's testimony.

### C. Defendant's Remaining Arguments.

Defendant next argues that the ALJ properly discounted Plaintiff's testimony because Plaintiff applied for unemployment benefits that carried an implicit assertion of the capability to do work. [Dkt. 16 at 13; R. at 13.] Defendant is correct that an application for unemployment benefits can undercut a claimant's credibility, *see Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005), but such an application is only "one of many factors impacting credibility." *Wilson v. Colvin*, No., 13-C-0633, 2014 WL 4338673, at *6 (E.D. Wis. Aug. 31, 2014). Here, the ALJ ignored other factors, such as the consistency between Plaintiff's testimony at the hearing, [R. at 68-69], and her reports of headaches to her doctors. [R. at 445, 515.] Thus, the ALJ's consideration of the application does not cure his decision to ignore evidence supporting

Plaintiff's credibility. *See Moore*, 743 F.3d at 1122 (noting credibility determination should turn on record as a whole).

Defendant then notes that the ALJ found that portions of Plaintiff's testimony related to her ability to walk, stand, and reach were not credible, and argues this is a sufficient basis for discounting all of Plaintiff's testimony, including her testimony about headaches. [Dkt. 16 at 11.] The Seventh Circuit, however, recently rejected a similar argument. *See Moon*, 763 F.3d at 722 ("[T]he reason [the ALJ] gave for doubting another portion of [Plaintiff's] testimony about migraines—her statement that she experienced side effects from her current medications—does not justify rejecting all of her testimony about migraines without further explanation."). Thus, the ALJ's reasons for discounting Plaintiff's testimony about walking or standing do not justify the adverse credibility finding with respect to Plaintiff's headaches.

Finally, this adverse credibility finding was harmful. In constructing Plaintiff's RFC, [R. at 21], and in asking hypotheticals of the vocational expert, [R. at 73-80], the ALJ did not include limitations related to Plaintiff's headaches. Plaintiff, however, testified that she suffered debilitating migraines that lasted for up to three days at a time and that even her "regular" headaches required her to lay down to alleviate the pain. [R. at 67-69.] When Plaintiff's counsel asked if jobs existed that could accommodate these limitations, the vocational expert indicated that such limitations would preclude the job opportunities that he had previously described. [R. at 79-81.] Thus, it is likely that if the ALJ had accepted Plaintiff's testimony and included limitations related to her headaches, his conclusions about her RFC and the availability of relevant work would have been different. *See, e.g.*, *Moore*, 743 F.3d at 1126 (recognizing "that full-time work does not allow for the flexibility to work around periods of incapacitation"). The Court therefore cannot predict "with great confidence," *Spiva* 628 F.3d at 353, that the ALJ's

decision would have been the same had he not erred, and remand is necessary. The ALJ on remand should reconsider Plaintiff's credibility, giving proper weight to the 2010 MRI and the rest of the record.

## Conclusion

For the foregoing reasons, the Court finds that substantial evidence does not support the ALJ's determination that Bledsoe was not disabled and the Magistrate Judge recommends that the Commissioner's decision be **REVERSED AND REMANDED**. Furthermore, the multiple errors in the ALJ's decision lead the Court to direct the Commissioner, on remand, to refer this matter to a different ALJ for consideration of Plaintiff's claims. Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), and failure to timely file objections within fourteen days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

Date: 10/31/2014

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

J. Frank Hanley, II
jfrankhanley@jfrankhanley.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov